Case No. 23.5118, James Connell, III, Appellant v. Central Intelligence Agency. Mr. Kaufman for the Appellant, Mr. Pullen for the Appellee. Thank you, Your Honor. Good morning. Brett Max Kaufman for the Plaintiff Appellant, James Connell. In light of all the record evidence in this case, the CIA's Glomar response is simply not credible. In its brief, the government hardly engages with this evidence. And in its declaration, it doesn't do so at all. Instead, the government takes the position that this court has already held by implication that the only way to defeat a Glomar response is through the waiver-based official acknowledgement doctrine. But this court's cases do not say that the CIA always wins unless it makes a waiver. Instead, they say that at the summary judgment stage, contrary record evidence can defeat the logic and plausibility of a government FOIA response. But do you say that essentially the CIA's declaration has issues because it doesn't explain how the information would be respecting to intelligence or any type of national security issue? Well, we don't take issue that the broad topic of the request could be protected under Exemptions 1 or 3, but I do think that the declaration is deficient in a lot of ways. It does not really explain at all how what will be revealed by it acknowledging the existence of records will actually be revealed. But I think that the reams of evidence here mean that the government shouldn't really get a second chance to explain that because it's just simply not credible that they could defend that secret. And that's the principle that the Second Circuit applied in Flores, that relevant evidence counts in a FOIA case. And it's not limited only to evidence that meets the official acknowledgement test, which, again, is a waiver doctrine. To reject that principle would be essentially to rewrite the FOIA statute. It would be to rewrite the summary judgment standards that apply to all civil litigation. And the CIA's argument has no limits. Its position is that no matter how much relevant evidence there is in a case, a court must bury its head in the sand and refuse to consider anything that doesn't come from the agency itself. But as Flores explains, that position makes no sense. In this case, the evidence overwhelmingly shows the CIA has additional records that are responsive to Mr. Connell's request. And when plausible deniability becomes implausible, like in this case, the court should reject the agency's formula. Turning to this principle theory, for more than 40 years, this court has held that government agencies are not entitled to summary judgment in FOIA cases if their affidavits are called into question by contradictory evidence in the record. As this court said in Gardles, courts must consider, quote, whether on the whole record, the agency's judgment objectively survives the test of good faith, specificity, and plausibility. In other words, the question is, with all the evidence considered, is the agency's justification for secrecy logical or plausible? Or, as the court put it in Gardles, does it make good sense? Just like in other civil cases, evidence is relevant in a FOIA case if it has prohibitive value to the ultimate question. Now, critically, of course, the court might weigh evidence from different sources differently in different cases. But the key point and the point of Flores is that it must consider all of it, not just evidence that is provided by the very same agency that's arguing for secrecy. As the Second Circuit put it, the contrary result would be a court deliberately burying its head in the sand to relevant and contradictory record evidence solely because that evidence does not come from the very same agency seeking to assert a glomer response in order to avoid the strictures of FOIA. So what about, you know, I appreciate the argument. We have these cases, Fragon, Moore, and others that essentially say, it seems like the analogy would be if the FBI had said over and over, the CIA had operational control over these 14 detainees at this exact time period at Guantanamo Bay. Fragon would say, CIA can still issue a glomer response. I'm just not sure how this case is distinguishable from that principle, which does seem pretty well established in our case. Yeah, it's a good question. So, Your Honor, Fragon, I think, doesn't quite go that far. So Fragon involves, of course, the OPM letter and CIA employment and a FOIA request about a CIA, a person who claimed they were a CIA agent. And they sought to use the letter from OPM to say, to defeat the CIA's glomer response. But the court really did base its holding in waiver. The last line of the opinion is, we hold that only the CIA can waive its right to assert an exemption to the FOIA. So there was a point at which this court started talking about official acknowledgement and the defeat of FOIA affidavits in terms of waiver. And that really started with Fitzgibbon in 1990. And since then, the court and litigants have pushed the argument in those terms. And, of course, waiver is a distinct concept from regular summary judgment standard. It's about whether an agency took an affirmative act or said an affirmative thing to no longer be able to rely on a FOIA exemption in the first place. But our argument and the argument that the Flores Court accepts. Seems like that just becomes the point of my first question is it seems like your conception just becomes an end run backdoor around those waiver holdings. Because your whole point is every newspaper in the world is saying or even another agency and Congress are saying CIA is doing this. But the CIA hasn't. If we think about it as waiver, CIA wins. And we think about it your way. CIA loses. Well, I don't think it's quite that that simple, Your Honor, because, one, we're not talking about newspaper articles. And if we came into court in this case or any other and we cited the New York Times citing anonymous sources and we said, look, it's obviously true. Both the Post and the Times are saying it's true. It must be true. Appreciate that. That's that. That would be a case where the FBI and Congress. Well, I think Congress is a good example. So if you look at military audit project there, there was a there was a congressional report put into evidence. And the court never mentioned waiver in that case. And it sort of considered how weighty is this? And in that case, the CIA, which had eight affidavits in that case, one of them actually took on the Senate report and it said, look, read the Senate report. It's just based on anonymous sources and newspapers. It's a committee reading the newspaper. So that's the kind of evidence that a district court judge could say that has no weight, especially against a CIA claim of harm or something like that. Compare that to this case where we have the definitive account of the government's torture program in a Senate report where there was process involved that allowed the CIA to respond to the report substantively, underwent a declassification review headed by the president of the United States. So no word was was released to the public. There's six thousand pages that are still redacted. So we're just talking about an executive summary. So the credibility of that kind of document is leagues away from what was at issue in military audit project. There was a Senate report also at issue in Salisbury. And it makes sense that this court and the district courts in those cases said, compared with what the CIA claims and defends its response on, those things don't defeat it. But in this case, I think you can't look at the Senate report without understanding that it is an authoritative document. It cites documents that for the proposition that the CIA had some measure of operational control. The report cites documents that the CIA produced. So the CIA in this litigation has said, yeah, whatever the report cites, we're actually giving you those things because they do relate to our operational control. And how does the Zubeda case relate to the Supreme Court? Zubeda relates to our official argument, official acknowledgement argument, which is, again, I just want to emphasize distinct from this argument that we make based on Flores. But the relevance of that case, I think, is is that in that case, that case, of course, involved state secrets claim the government made. And the individuals that were asked to give testimony that the government got in the way of in that case were former contractors of the CIA. So one really significant piece of that is that they were former contractors, because under this court's cases and others in the Second Circuit, as a general rule, former officials cannot acknowledge on behalf of an agency. That's almost textbook official acknowledgement law at this point. But the Zubeda court said, actually, given the circumstances here, that doesn't make sense. These guys were central participants in the events that are being asked about. And therefore, they can acknowledge for the CIA in this instance. And it was the government, of course, in that case, making the claim that they could and that their acknowledgement would be tantamount to an official acknowledgement by the CIA itself. And as we point out in the briefing, that case is actually consistent with the reasoning of this court's case in Amazighan, where the court held that a lawyer for a detainee would be officially acknowledging information on behalf of the government if they went out to a foreign government and revealed information that they had acquired during litigation. A very sensible ruling and one that makes clear that the official acknowledgement doctrine is not as strict as perhaps some of the cases and some of the government's arguments make it sound. Do you actually get any more documents than what you already have, you know, if we ruled for you? Well, unfortunately, that's one of the pitfalls of this kind of litigation, Your Honor. As the most famous example being ACLU v. CIA, where in a great opinion by this court, the Glomar response was rejected. And we went back and we never saw a single document after two more years of litigation. But the government did acknowledge the existence of hundreds of hundreds of documents and it described. So I think that shows the importance of actually holding the government's feet to its fire when it issues a Glomar response, simply because down the road we may not see the documents we're actually interested in seeing. It doesn't mean that the government gets to hide behind a Glomar response and not even engage in the normal fire process. That really makes no sense. Let me just ask you to clarify something regarding the Senate Select Committee report. On your second, I guess, more refined request or something, the CIA gave you the itinerary for a visit or proposed visit. And what was the distinction that caused them to release that and not anything else? I don't know, Your Honor. You're going to have to ask the CIA about that. There was no explanation. Not that I'm aware of. We didn't litigate the case in the district court, so it's possible somewhere down there there is an explanation. But I don't believe we got an explanation. And in my experience, you don't get much of an explanation when they re-release a document. Simply just give it to you. So the report, what was in the report that would relate to, you're familiar with the report. The Senate report. Yes. It would relate to the proposed itinerary. Was it mentioned in the report? Was it described? I believe the citation in the sentence that says the CIA had operational control during this time, it cites to a background memo which also had an itinerary next to it or combined with it. And so that is the document cited for the very proposition that the CIA did have operational control. But I think it's a good point to actually look at the released document, because on its face it doesn't necessarily point to operational control. There was a lot of redactions in there. And I think that's why it's significant that the CIA acknowledged that it was related to its operational control. Not operational control generally, but responsive to Mr. Connell's request about the CIA's operational control. There is also the Memorandum of Agreement, which is J.A. 417. That document, the Camp 7 commander during the military commissions testified that that was a document that governed Camp 7. And that document in unredacted text says that it sets out the duties and responsibilities of the two agencies, DOD and CIA, signed by the directors that concern the government's detention of terrorism suspects at Camp 7. But what the MOA says is that from September 1, 2006 forward, the beginning date of your request, the detainees are DOD's responsibility. Well, it does say that in some terms in the unredacted text. Of course, there's a lot unredacted. There are other responsibilities, including communications with Congress. And this goes to our point about the breadth of the term operational control. You know, the government has treated it all along like an on-off switch. Either the CIA had operational control or it did not. We don't think that that is the most sensible way to understand that term. I mean, just think about if someone asked who has operational control of this courtroom. Is it your honor? Is it the clerk? Is it the marshals in the back? Is it the administrative office? It's the clerk. But I think we would all say that there's some measure of operational control belongs to everybody. And I think that's the most sensible way to read Mr. Connell's request. Not as the government wants to, as an on-off switch that means that the CIA either does or does not have that control. And once you accept that, the idea that the CIA has absolutely no more documents responsive to this request is just simply not credible. It's just not a credible response, given the evidence. No. But they didn't say they have no more documents. That's not the issue, right? Well, if they do have documents, I think this is ACLU v. CIA. If it's clear from the record that they do have additional documents, the Sklomar response cannot be sustained. To that point, though, during the military commissions, testimony was elicited that from a DOD, from a Camp 7 commander, that the DOD had operational control and the CIA did not. But that's an interesting response, given the Sklomar response, because Sklomar is supposed to protect both sides of that secret. So either the Camp 7 commander is wrong and lying, that there was no operational control, and the CIA should just say we had none and we have no records. Or we're correct, and that was simply an interpretation of operational control that is different from the most sensible reading of it. Well, it's coming from a different region. Absolutely. We understand that, and we're not relying... Which would very well explain a different understanding of what operational control is. It could, and I think that actually makes sense, given our theory, that operational control is a broad term. But back to the... How do we adjudicate the right way to think about the request, right? So it sounds like you want us to read it to mean basically any documents about CIA's connection with Camp 7 during this time period. It's not really quite what it says, and it seems like the government interpreted it far more narrowly about, do you have documents about the nature and extent of CIA's operational control? And what they're saying is, if we respond to that, that's going to reveal something that's currently classified, which is whether or not we have such a connection. Right. Well, one, I think, just first principles, the requester in FOIA is in control of the request. So I think that's point number one. Number two, of course now the CIA is saying X or Y will be revealed, and it has such a narrow meaning that there's this great secret that's going to be revealed if we say we have more documents. But if you actually look at the declaration in this case, they say exactly what we're saying. They say Glomar kept secret a, quote, potential classified connection. That's at JA 43, paragraph 26. At paragraph 20 in JA 4041, CIA searched for records about an unclassified, quote, relationship with Camp 7. So our understanding of the term is confirmed by how they treated the request behind closed doors. So now they're in litigation and they say that the sky is going to fall if they acknowledge they have records. A little squirrely, but I think the declaration never says connection with Camp 7. It repeatedly says connection with the subject matter of the FOIA request, which is not exactly illuminating, but it's not as favorable to you as what you just described, I don't think. Fair enough. I read it differently. I mean, they say the connection with the subject of the request, which is CIA operational control at Camp 7. I'll take a little squirrely rather than just squirrely. But so I think right there you have the CIA understanding it in normal terms. This just confirms the ordinary reading of the request. It's not a real stretch. It's not trying to pick and choose things that the CIA said that help us. It's literally how they handled the request once they took it in and had to go about the normal part of FOIA, which is figure out what records this person is asking for and go find them within the agency. I don't understand that under the ACLU case versus CIA that they have three options with respect to releasing them, doing the bond index or doing the no number, no list. But are you requesting that we urge them to do one of the three or that they just be allowed to participate in these options? Well, I think just like in that case, we're asking this court to reject the Glomar response. And again, the government has options on remand. There's no denying that. And we're well aware of that. Of course, this court in ACLU v. CIA did caution that if they choose to go the no number, no list route, the court would want to see a particularly persuasive affidavit because it's just to use your term, your honor, a little squirrely of a response to say, well, we have documents, but the depth of our interest is classified. It just becomes a little bit slippery. And given this court's admonishments in Vaughn going all the way back there and ACLU v. CIA, it's understandable that the court would want to see a really good explanation for why that stuff remains secret. Of course, the quotas to a lot of these litigations actually suggest that that's not what's going to happen in this case, your honor. ACLU v. CIA is one where, again, they identified or described at least hundreds of documents on remand. Flores itself is one where the court didn't even reject the Glomar response. It just said the court, the district court needs to consider it. And the CIA ended up releasing some of those documents. So, you know, the CIA does hold tight to these Glomar responses. But once they're defeated, the sky doesn't fall. They are able to engage in a normal FOIA search like they like most agencies do every day in FOIA. I do want to draw the court's attention, and I know my time's up, just one document that is in the record that we think actually is a responsive record that was not produced. And perhaps the court could look at that document and decide that defeats the Glomar response on its own. And that's the interagency meeting memo. It's a J.A. 359. It was obtained by the ACLU in FOIA litigation 10 years ago. It's discussed at our opening brief at 4041. And that describes a November 2006 meeting involving the CIA and other agencies discussing several security issues concerning the 14 high value detainees at Camp 7. And it says that the group reached consensus on several issues. It also says that individuals working on detainee issues at Camp 7 would require CAA code word security clearance. So that's a document that should have been responsive in this litigation that was not produced and that could and should defeat the agency's Glomar response on its own. Thank you. I'm sorry. It was released in other FOIA litigation, but not in this litigation. Thank you. Thank you. Good morning, and may it please the court. Thomas Pullum for the Central Intelligence Agency. This court has held that if a FOIA requester attempts to compel the disclosure of protected information on the ground that the information is in the public domain, the requester must establish that the exact information at issue has been officially acknowledged by the same agency from whom the information is sought. Disclosures of similar information or disclosures made by other government entities the court has held do not suffice. But in this appeal, Mr. Connell argues that none of those cases matter because a FOIA requester can simply avoid the strict requirements of the official acknowledgement doctrine by arguing that the presence of information in the public domain makes the agency's attempt to invoke an exemption not logical or plausible. This court should not permit the requester to do through the back door what this court's precedent bars at the front. The official acknowledgement doctrine is based on the recognition that confirmations from an intelligence agency itself are fundamentally different because they are given unique weight and eliminate all doubt on a question. Those same principles foreclose Connell's argument. Further, Connell offers no argument that the documents he relies on contradict CIA's assertion that confirming or denying the existence of responsive documents would disclose information relating to intelligence sources and methods. Because that assertion is logical and plausible, the agency's GLOMAR response is supported by two independent FOIA exemptions. We ask that the judgment be affirmed. So counsel's argument is that it's not plausible in light of the various things that have appeared in the Senate Select Committee report, etc. And are you saying that that's not relevant or that plausibility is that plausibility is not established? So I'm saying that plausibility. Yeah, this court has a doctrine to address that exact argument that public information prevents the assertion of FOIA exemption. That's the argument here. So those cases apply on their face. And the same principles are involved, that there's a critical difference between confirmations from an intelligence agency and statements from others, that those confirmations are given unique weight. And the court has said that kind of those considerations apply with greater force in the intelligence context. And this court has rejected several times attempts to kind of end run the official acknowledgement case. In night, the court addressed an argument that a statement from the State Department, even if it weren't an official acknowledgement, undermined the GLOMAR response. And the court said, no, that statement from this other agency is far different from an admission by the intelligence agency. And that's what makes it logical and plausible. So if the SSCI report just flat out says that the CIA had operational control over these detainees, if that statement was from the CIA, if that had been in one of the documents the CIA produced, would you concede that a GLOMAR response would be implausible? I think it depends on the request is for documents about whether CIA has operational control during this time period. And a CIA document, one, just one says CIA had operational control. I mean, I think we would. It would certainly be different and it would change the scope of waiver. And the question would just be whether there's anything else outside. And Wolf is instructive in this regard, I think. In that case, there was a request for documents about a certain individual, a Colombian politician. I believe that Judge Garcia is very pointed and very narrow in the question he's asking you. And you're giving us a response that kind of says, look at other documents in the totality of the circumstances, essentially. But if he's referring to one specific document that has that statement, that's the response. Then it would waive with respect to what's incorporated in that statement. Right. OK. So I think something turns a lot turns here on how CIA is interpreting the scope of the request. I think one way to ask this is that in the background memo to the itinerary for the visit on J.A. 320. It says once a good C.I.A.'s endgame is to assist D.O.D. in any way possible in the military commission process. While at the same time, I think C.I.A. isn't that an official acknowledgement of some C.I.A. connection? Or are you drawing a distinction between that kind of a statement and operational control over these detainees? So I think this gets to what I was trying to get out before is that that. Waves the Glomar response to the extent of the acknowledgement, which is that C.I.A. has this kind of very limited role that doesn't necessarily go to operational control, but with respect to that, it kind of will support D.O.D. in the commission process. The memorandum of understanding that the council referred to says that D.O.D. and C.I.A. will coordinate on public affairs matters. So C.I.A. has you. How do you understand operational control? So there's a FOIA request. You say you cannot confirm or deny what whether you have documents responsive to the request. And it's a little bit unclear just what the what C.I.A. interpreted the request to be. Well, the clearest articulation, it was unclear what it meant. That's why the agency asked for clarification. And the requester came back with kind of it said, I want to know what operational control means. And here are seven things. And the agency said, OK, we are looking at what operational control means through the lens of these seven examples. And the agency did a search for documents that reflect an acknowledged connection between the agency and the request. And it released those. Anything that goes to. A further relationship that's not reflected in what's been acknowledged, that's what's protected by the Glomar response. So it protects whether C.I.A. has an additional relationship to the control of this facility beyond what is reflected in the documents that have been released. C.I.A. chose not to classify or redact the portion of the torture report in that respect about its operational control. So this court has addressed that very argument in one of its foundational cases in this area, which is Afshar. In that case, the requester pointed to books by former C.I.A. or I forget the exact agency, but former agency employees and said, well, those books have been subject to prepublication review. So the agency could have stopped information from coming out. And the court said, no, that's not enough to make it an official acknowledgement. So the same thing. Afshar predate Zubeda. It does, but Zubeda involved did not involve FOIA. It referred to FOIA cases as an analogy and an imperfect one at that. And I don't think there's anything in Zubeda that would call for an overruling of FOIA cases, given that it wasn't in that context. And I want to be clear about one point with respect to that case, is that in the context of the state secrets doctrine, it was asking, would these disclosures by contractors cause harm and harm to the national security? And the court said, well, yes, they would cause some harm, kind of analogizing it to official disclosure. But that doesn't mean that disclosures by contractors, which were likely to be given some level of credibility, would be the same as disclosures by the agency itself. That's a full other step that the court didn't reach. And I think there's no reason to think that the court was silently overruling a well-established part of official acknowledgement cases, given that it said, you know, it made clear this isn't actually an official acknowledgement case. This is just by analogy. We're drawing on the same ideas that certain disclosures carry a risk of harm, greater risk of harm than others. So their contractors gave some, but it's not the same necessarily as the agency. And how does time impact disclosure of the risk? For example, if you're in 2024 thinking about a document that was available or acknowledged or actually even made in 2012, and yet that particular situation has passed and it's a historical event now, is there a difference in how you would respond or would you just say? No. So that's something when we're looking at harm to the national security, that's something that an original classification authority would take into account when deciding whether this information is classified. But I want to make one point that I think is very important, is that this GLOMAR response was justified on both B-1 and B-3. The question under B-3 is only whether there's a statute that qualifies, and there's no dispute here that the National Security Act qualifies. And then the question is, does the information fall within that statute? And so the question when we have the National Security Act is only, would it reveal information that relates to sources and methods? There is no requirement of harm to the national security under B-3 because Congress has already made the determination that these releases should not be made. That is the harm. It's already captured in the coverage of the statute. Can you give us your response to the interagency memo, which I was also going to ask about? I think there's two questions. One is just your response to opposing counsel's argument that it should just defeat your GLOMAR response. And the second is, why wasn't it produced in this case if it was already public? So two responses. One, I'm not sure that it, and I didn't hear an argument that it relates, that it provides any information about CIA's operational control kind of through the lens of the seven identified factors. As to why it wasn't produced, I couldn't, the agency didn't address whether it thought the argument or the document was. Well, presumably if you're right on the first point, then it wasn't responsive. Yes, it could also be that it wasn't in the, I mean, the agency described how it did a search, which was a search of a particular database collection of documents that had been disclosed or deemed kind of appropriate for release. And it might also not have been in that collection. And we don't know if the agency actually has that document. But I would like to make a point about, counsel tried to say, well, there's something about whether the other disclosures that are relied on the committee report or, you know, other things are especially credible. One that doesn't address or account for Frugone, where OPM, the agency in charge of kind of information about executive branch employees, said CIA has your employment records. That would appear to be a very credible assertion, notwithstanding that this court held that the CIA could not be compelled to disclose information whether it had records. The other case is Fitzgibbon, which involved a congressional document. The document in that case disclosed the location of a station. That document, the district court said, cited CIA cables for that information. So it's exact analog here. The congressional body cited agency documents and said, based on that, we're representing this fact. This court said not an official acknowledgement, not an official disclosure because it was made by Congress. And how does operational control relate to intelligence source or the method? Yeah, so it relates to intelligence, I think most clearly methods and activities. Activities is one of the terms in the executive order. Intelligence methods are the means by which an agency carries out its intelligence gathering mission and the authorities for those means. And activities has a kind of similar definition. It's the means by which agencies gather intelligence and kind of specific operations that are carried out. So this is clearly, and I'm sorry, the requester offers no argument that what the Senate committee characterized as the operational control of this facility would not qualify as. The declaration doesn't specifically say anything that you're saying here. It says that it defines activities and methods and says that this information would disclose information about intelligence methods and activities. So I think that I think the import is fairly clear. Now, if the court thought that the declaration were deficient because it didn't go into enough detail, then the proper solution would be not to say that the Glomar response can't be used and force the agency to disclose classified and statutorily protected information, but rather remain to give the agency an opportunity to fill in those details that the court thinks is missing. Given the kind of real stakes at issue here, that would be most appropriate. If there are no further questions, we ask that the judgment be affirmed. Thank you. Thank you. Thank you. So the CIA mentions a few cases in its favor that we think actually help us. So just quickly to hit on them. Night night is a case where at the end of the opinion, the court actually does consider whether our floor has argument. It says notwithstanding official acknowledgment, does the State Department press statement undermine the CIA's Glomar response? In that case, they said no. But again, that just raises two points. One, that weight will play out differently depending on the evidence available. There, the court found that the State Department press statement did not weigh the arguments the CIA made in its declaration. But here this is an exceptional case where they do. Fitzgibbon, the CIA mentioned as well, that that one also helps us there. The court did not reject the CIA. I mean, excuse me, the Senate report out of hand. It said that it related to a different time period and it simply didn't acknowledge the information at issue in the request. They considered it. They said it didn't match in offshore. That case also helps us. As your honor pointed out, Judge Childs, Zubeda came afterwards. So that has to be accounted for. But even more directly in the case, in offshore, the court compares the weight of the statements of former officials against media speculation and says those are kind of the same thing. So the court was making a judgment that that wasn't that credible in that instance. And we think that all the evidence here does add up to undermine the Glomar response and show that there are more documents that the CIA has here. Judge Garcia, you asked a question that I think there's one thing in the record that is relevant to the answer. I just want to sort of the consequence of answering the response here for the CIA. There is a fully withheld document in the record, I think it's J.A. 77. And they basically describe it in general terms and have no more information about it. Don't produce it. Don't redact it. I think it's very hard to understand as a matter of logic and plausibility. How the government can release that document. But then the sky will fall if it acknowledges it has additional documents. And so even on the government's own terms that it's already released everything that that is unclassified about this connection. I think it's I think it's simply not a credible argument. So on index, is that what you. That's right. That is the agency essentially giving that brief Vaughn description instead of providing a redacted document. I think it's a 20 something page document. I think on the Vaughn, they mislabel it as 30 something. They corrected that later. But but I it does beg the question of how the agency can provide a document that's responsive, that says absolutely nothing about anything. And then harm will come if if the agency acknowledges that it has additional records in its possession. So, again, I think that this is not a case about an end run. This is about a case pushing the credibility of the agency and to the breaking point and asking the court to play along. And I think as the court did in a CLAB CIA, there comes a point where the court has to say no to these games of secrecy. And this is one of those cases. Thank you. All right. I heard your arguments. We'll take it under advisement and the case is submitted.
judges: Childs, Garcia, Ginsburg